**MARATHON OIL COMPANY, Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES, Appellee.**

No. S–13771.

Supreme Court of Alaska.

June 10, 2011.

29. *Id.*

Rebecca S. Copeland, Kyle W. Parker, and David J. Mayberry, Crowell & Moring LLP, Anchorage, for Appellant.

Martin T. Schultz, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Gas producers that lease land from the State of Alaska must pay royalties calculated on the value of the gas produced from the leased area. This royalty payment can be calculated under one of two methods: (1) "higher of" pricing or (2) contract pricing. "Higher of" pricing is the default. Computing the royalty owed under "higher of" pricing involves sophisticated calculations using market data and the prices of other producers. The Department of Natural Resources (DNR) usually does not calculate the royalty payment under "higher of" pricing until years after the time of production, once an audit can be completed. In order to pay royalties under contract pricing, the lessee must first request that form of payment calculation from DNR. Under contract pricing, the lessee's price at which it sells gas is used to determine the lessee's royalty payment.

Marathon Oil Corporation (Marathon) began production in the Ninilchik gas field in 2003. In 2008, before completion of the audit to determine the "higher of" royalty payment for 2003–2008, Marathon requested contract pricing from DNR. Marathon requested contract pricing for the period of 2008 onward and sought retroactive application of contract pricing to the 2003–2008 period. DNR approved Marathon's request for contract pricing from 2008 onward but denied the request to apply contract pricing to production prior to 2008. Marathon appealed to the superior court, which affirmed DNR's ruling. Marathon appeals.

Marathon has three arguments. First, Marathon argues that the statute that governs contract pricing—AS 38.05.180(aa)—permits retroactive application of contract pricing and that DNR was wrong to deny Marathon's request. We conclude that the statute is ambiguous, and because DNR's interpretation is longstanding and has a reasonable basis in the statute, we defer to its interpretation. Second, Marathon argues in the alternative that even if DNR's interpretation of the statute is valid, DNR was obliged to promulgate its interpretation as a

regulation before applying it to any party. We conclude that DNR's interpretation is a rule of internal agency procedure and therefore did not have to be issued as a regulation. Third, Marathon argues that DNR's treatment of Marathon violated due process. We conclude that Marathon's due process rights were not violated. We therefore affirm the superior court's decision upholding DNR's order.

## II. FACTS AND PROCEEDINGS

Marathon leases land from the State of Alaska for the purpose of producing natural gas. Marathon has many natural gas leases on the Kenai Peninsula, including one at Ninilchik.

Gas lessees must pay a royalty to the State in the amount of 12.5% of the value of the gas produced in the leased area. Determining the value of the gas produced for the purpose of calculating this royalty is usually done through "higher of" pricing. The value of the gas produced is deemed to be the highest of four possible prices.[1]

Lessees must deliver royalty payments on or before "the last day of the calendar month following the month in which the oil, gas, or associated substances are produced." But the four values needed to calculate the royalty under "higher of" pricing are usually not determined until several years after the time of production, after DNR performs an audit. After the audit, a lessee's royalty liability is often "re-adjusted upward."

In 1986 the legislature amended the royalty statute.[2] The amendments, codified in AS 38.05.180(aa) and AS 38.05.180(bb), allowed lessees to request contract pricing rather than the default "higher of" pricing. Contract pricing permits lessees to use the price at which they sell gas to Alaska utilities as the price on which royalties will be calculated. The stated purpose of the 1986 amendments was to benefit utility consumers.[3] The contracts between gas producers like Marathon and gas-purchasing utilities had historically allocated the risk of higher royalty payments to the utilities. That is, producers sold gas to utilities under a long-term contract with a fixed price for gas. If the market price of gas rose above the contract price, producers had to pay higher royalties. Under the terms of their contracts with utilities, they could pass on this added expense to utilities. Utilities would then pass the expense along to their consumers. The 1986 amendments allowed lessee-producers to use their contract price as the royalty price, thus avoiding this possible increase in consumers' utility bills.

In 1995 DNR leased lands in the Ninilchik Unit on the Kenai Peninsula to Marathon for the purposes of gas production. Marathon began production on this land in 2003. In 2008 Marathon requested contract pricing from DNR, both for future production and for past production between 2003 and 2008. DNR approved Marathon's request for contract pricing from 2008 forward but rejected the request for the 2003–2008 period. The

---

1. The four prices are: (1) "the field price received by the lessee for the oil, gas, or associated substances"; (2) "the volume-weighted average of the three highest field prices received by other producers in the same field or area for oil of like grade and gravity, gas of like kind and quality, or associated substances of like kind and quality at the time the oil, gas, or associated substances are sold or removed from the leased or unit area or the gas is delivered to an extraction plant if that plant is located on the leased or unit area; if there are less than three prices reported by other producers, the volume-weighted average will be calculated using the lesser number of prices received by other producers in the field or area"; (3) "the lessee's posted price in the field or area for the oil, gas, or associated substances"; or (4) "the volume-weighted average of the three highest posted prices in the same field or area of the other producers in the same field or area for oil

of like grade and gravity, gas of like kind and quality, or associated substances of like kind and quality at the time the oil, gas, or associated substances are sold or removed from the leased or unit area or the gas is delivered to an extraction plant if that plant is located on the leased land or unit area; if there are less than three prices posted by other producers, the volume-weighted average will be calculated using the lesser number of prices posted by other producers in the field or area." STATE OF ALASKA, DEP'T OF NATURAL RES., COMPETITIVE OIL AND GAS LEASE (ADL No. 384372), ¶ 38 (1995).

2. Ch. 55, SLA 1986.

3. Letter from Esther C. Wunnicke, Comm'r, Dep't of Natural Res., to Rep. Richard Schultz (Apr. 22, 1986).

commissioner stated that he "decline[d] to grant retroactive approval under the terms of the statute." Marathon requested reconsideration, arguing that AS 38.05.180(aa) permitted retroactive approval. DNR affirmed its earlier decision, reasoning that "AS [3]8.05.180(aa) does not authorize the Department of Natural Resources to grant retroactive approval." Marathon appealed, and the superior court affirmed DNR's order. Marathon appeals.

## III. STANDARD OF REVIEW

We interpret statutes "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters." [4] We decide questions of statutory interpretation on a sliding scale: "[T]he plainer the language of the statute, the more convincing contrary legislative history must be." [5] We use one of two standards to review agency interpretations of statutes.[6] We apply the reasonable basis standard, under which we give deference to the agency's interpretation so long as it is reasonable, when the interpretation at issue implicates agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions.[7] We apply the independent judgment standard, under which "the court makes its own interpretation of the statute at issue, ... where the agency's specialized knowledge and experience would not be particularly probative on the meaning of the statute." [8] We give more deference to agency interpretations that are "longstanding and continuous." [9]

It is DNR's job to manage the state's resources and to collect royalties from gas lessees.[10] We have explained that the reasonable basis standard is appropriate when an agency's adjudication of a regulated party's claim "requires resolution of policy questions which lie within the agency's area of expertise and are inseparable from the facts underlying the agency's decision." [11] The question whether to allow retroactivity lies within DNR's expertise. Allowing retroactivity could have important consequences for how royalties are assessed and paid. The state royalty and audit system is complicated, and DNR has expertise in deciding when retroactive application makes sense within that system.[12] In *Alaska International Construction v. Earth Movers of Fairbanks*, we explained that " 'the comparative qualification of court and agency to decide the particular issue' [is] the most important factor for whether a court should substitute its judgment for that of an agency's." [13] Here, where the question implicates "special agency expertise" and is not "merely ... a question of statutory interpretation," we use the reasonable basis standard.[14]

## IV. DISCUSSION

### A. DNR's Interpretation Of AS 38.05.180(aa) Is Reasonable.

In 1959, shortly after statehood, the legislature passed the Alaska Land Act and gave DNR the responsibility for managing state-

4. *Native Village of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999).

5. *Alaskans For Efficient Gov't, Inc. v. Knowles*, 91 P.3d 273, 275 (Alaska 2004) (quoting *Ganz v. Alaska Airlines, Inc.*, 963 P.2d 1015, 1019 (Alaska 1998)).

6. *Matanuska–Susitna Borough v. Hammond*, 726 P.2d 166, 175 (Alaska 1986).

7. *Id.*

8. *Id.*

9. *Premera Blue Cross v. State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1119 (Alaska 2007).

10. AS 38.05.020, .180.

11. *Earth Res. Co. v. State, Dep't of Revenue*, 665 P.2d 960, 964 (Alaska 1983).

12. *See Kelly v. Zamarello*, 486 P.2d 906, 917 (Alaska 1971) (holding that reasonable basis deference is appropriate in areas with "complex subject matter").

13. 697 P.2d 626, 633 (Alaska 1985) (quoting 4 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 30.14, at 269 (1958)).

14. *Union Oil Co. of California v. State*, 804 P.2d 62, 64 (Alaska 1990).

owned land.[15] The Alaska Land Act provided that state lands were open to oil and gas development and gave DNR the power to lease state lands for that purpose.[16] The Alaska Land Act required that DNR, when it leased state land, collect a royalty of at least 12.5% of the value of all oil and gas produced.[17] To determine a lessee's royalty obligation, DNR must calculate the value of the oil and gas produced by the lessee. To determine the value of the oil and gas produced by a lessee, DNR historically has not used the price at which the lessee actually sold its oil or gas. Rather, DNR has used an approximation of market price. In its lease agreements, DNR has obligated lessees to pay 12.5% of the "higher of" four different values.[18] These four values are designed to estimate the market price of oil and gas. The goal of "higher of" pricing is to ensure the state's royalty is not based on a below-market sales price.

The 1986 amendments to the Alaska Land Act allowed lessees to calculate their royalty obligations using a different, potentially more favorable method. The amendments permitted lessees to use the price at which they contracted to sell gas to Alaska utilities as the basis for calculating the state's royalty.[19] To use this "contract" price, the lessee must apply and receive permission from DNR.[20]

The question presented is whether a lessee must apply for contract pricing before production actually occurs. For at least ten years, DNR has interpreted the 1986 amendments as permitting DNR to approve contract pricing only for future production. Thus, a lessee can apply to have contract pricing used to calculate its royalties for future production, but not for gas production that has already occurred. Marathon disputes this interpretation, arguing that the statute permits DNR to use contract pricing for past production. Marathon offers alternative statutory interpretations, proposing several cutoff points after which a lessee would no longer be permitted to apply for contract pricing. Marathon even suggests that a lessee could apply for contract pricing after the completion of the audit to determine its "higher of" royalty liability so long as the lessee applied "before the statute of limitations ran."

█ To establish the meaning of a statute, we examine both its text and its purpose.[21] We will give the appropriate deference to DNR, deferring to its interpretation "so long as it has a reasonable basis in the law." [22]

### 1. The text of the statute
#### a. The meaning of "prospective"

Alaska Statute 38.05.180(aa)(2)(B) provides that DNR should not approve a request for contract pricing if "the *prospective* reduction in royalty receipts would not be balanced by increased benefits to in-state gas and electric consumers." (Emphasis added.) DNR notes that Black's Law Dictionary defines "prospective" as meaning "[i]n the future." [23] According to DNR, "prospective" refers to the "future period after the application is approved" and therefore AS 38.05.180(aa) only allows contract pricing for future production. DNR maintains that AS 38.05.180(aa) does not permit application of contract pricing to past production.

Marathon argues that the word "prospective" has a different meaning within the context of the statute. In Marathon's view, the legislature's reference to "prospective reduction in royalty receipts" is "not the same as requiring that a request be made in advance of or commensurate in time with first gas production." Marathon instead argues that

---

**15.** Ch. 169, SLA 1959.

**16.** Ch. 169, Art. VIII, § 3, SLA 1959; Ch. 169, Art. II, § 4, SLA 1959.

**17.** Ch. 169, Art. VIII, § 3, SLA 1959.

**18.** *See supra* note 1.

**19.** AS 38.05.180(aa), (bb).

**20.** AS 38.05.180(aa).

**21.** *Borg–Warner Corp. v. Avco Corp.*, 850 P.2d 628, 633 n. 12 (Alaska 1993) ("Statutory construction begins with an analysis of the language of the statute construed in view of its purpose.").

**22.** *Wilber v. State, Commercial Fisheries Entry Comm'n*, 187 P.3d 460, 465 (Alaska 2008).

**23.** BLACK'S LAW DICTIONARY 1222 (6th ed. 1990).

the word refers to the future effects of DNR's decision to approve or deny a request for contract pricing. According to Marathon, DNR can decide to approve contract pricing for any period, past or future, but DNR must consider the "prospective" effects of that decision. Marathon contends that "DNR may still consider the 'prospective reduction in royalty receipts' resulting from use of the contract price even if the royalty would [correlate] with gas deliveries and production occurring in the past."

The term "prospective" could plausibly have either meaning. The use of the word could signify that the legislature only intended contract pricing to be available for future gas production; or the use of the word could be incidental "and the timing of the [application] . . . immaterial." We agree with the superior court that "the phrase 'prospective reduction in royalty receipts' is ambiguous."

### b. The scope of AS 38.05.180(aa)(2)

■ Marathon argues that AS 38.05.180(aa)(2) provides an exhaustive list of the reasons that DNR may reject a request for contract pricing. Alaska Statute 38.05.180(aa)(2) provides that DNR should reject a lessee's request for contract pricing if the commissioner makes a finding that

(A) the contract price or transfer price is unreasonably low;

(B) the prospective reduction in royalty receipts would not be balanced by increased benefits to in-state gas and electric consumers;

(C) the lessee and the utility are related in management, ownership, or other aspect and, in the case of a transfer price, that relationship is not regulated under AS 42.05; and

(D) the contract price or transfer price is not in the best interest of the state.

Marathon contends that because retroactivity is not among the listed reasons for rejection, DNR had no right to refuse Marathon's request for retroactive application. Marathon claims that AS 38.05.180(aa) creates a pre-

sumption in favor of approval and that DNR did not respect this presumption. But AS 38.05.180(aa)(2)'s core scope is more limited than Marathon contends. Alaska Statute 38.05.180(aa)(2) provides an exhaustive list of the *price-related* reasons DNR can reject requests for contract pricing, but the statute does not address other grounds for rejection. The legislative history of the 1986 amendments indicates that AS 38.05.180(aa)(2) is exclusively concerned with objections to the price a lessee submits as its contract price.[24] Other non-price related reasons for rejecting a request may still exist. If DNR is correct that the statute does not authorize retroactive contract pricing, then DNR is justified in rejecting such a request even though the statute does not specifically list that reason for rejection. Therefore, AS 38.05.180(aa) would not preclude DNR from rejecting Marathon's request. As we will discuss below, agencies are generally given discretion to manage such procedural matters.

### 2. The purpose of the statute
#### a. The pro-consumer purpose of the 1986 amendments

Both parties agree that the purpose of the 1986 amendments was to benefit consumers: The statute lowers the amount of royalties paid by gas producers, and the savings are passed on to consumers. Marathon points to this pro-consumer purpose of the 1986 amendments and argues that allowing retroactivity would further this legislative purpose. Marathon argues that (1) the purpose of the statute is to benefit consumers by using contract pricing; (2) retroactivity results in more contract pricing; and (3) therefore, retroactivity is consistent with the purpose of the statute. Marathon cites extensive legislative history to support its argument, but while this legislative history generally recognizes the benefits of contract pricing, it does not answer the question whether the statute permits retroactivity.

■ Although it is true that the stated purpose of the 1986 amendments was to benefit consumers, the 1986 amendments exist

---

**24.** Letter from Esther C. Wunnicke, Comm'r, Dep't of Natural Res., to Rep. Drue Pearce (Apr. 28, 1986).

within the larger goals of the Alaska Land Act. Alaska Statute 38.05.180(a) recites the goals of the Alaska Land Act:

(a) The legislature finds that

(1) the people of Alaska have an interest in the development of the state's oil and gas resources to

(A) maximize the economic and physical recovery of the resources;

(B) maximize competition among parties seeking to explore and develop the resources; [and]

(C) maximize use of Alaska's human resources in the development of the resources.

As we have recognized, the overall purpose of the Alaska Land Act is to maximize revenue for the state: In *Chevron v. LeResche* we pointed out that the purpose of the Alaska Land Act was "to provide for orderly oil and gas leasing that maximizes state return on its oil and gas resources," and that this fact should influence the statute's construction.[25] And as Marathon acknowledges, AS 38.05.180(aa) is "an exception to the goal of maximum royalty recovery."

Though the 1986 amendments' purpose of benefiting a smaller subset of Alaska's utility consumers would arguably support Marathon's interpretation, the Alaska Land Act's overall purpose of maximizing revenue for all Alaskan citizens would support DNR's interpretation. The 1986 amendments and their legislative history do not provide guidance as to which purpose should predominate in this case.

### b. The legislative tolerance for retroactivity

Marathon points to the retroactivity that exists elsewhere in the statute and the fact that audits and royalty calculations occur well after the time of production. Royalty calculations involve amounts, such as "tax reimbursement amounts," that cannot be known until some time after production.[26] Marathon argues that the 1986 amendments reflect a tolerance for retroactivity and that, therefore, the statute allows retroactive requests for contract pricing. But Marathon ignores a crucial distinction between the type of retroactivity it seeks and the retroactivity built into the statute's structure. The statute recognizes that royalties will be *calculated* retroactively, but that is different than allowing the method used to calculate royalties to be *applied* retroactively. Royalties are necessarily calculated after the fact because the amount of gas production and other inputs will not be known until after production has occurred. Selecting which royalty calculation method to apply, however, can be accomplished before production has occurred.[27]

### 3. We defer to DNR's longstanding interpretation.

▮▮▮▮ The key to our decision is the standard of review. We conclude that the statute is ambiguous and provides no direct answer whether retroactive contract pricing is permitted. We have recognized that "an agency's interpretation of a law within its area of jurisdiction can help resolve lingering ambiguity."[28] We therefore defer to DNR's interpretation that both the 1986 amendments' use of the word "prospective" and the Alaska Land Act's purpose of maximizing revenue prohibit it from approving retroactive contract pricing and we therefore conclude that it has a reasonable basis in the statute.

We are especially inclined to defer when an agency's statutory interpretation is longstanding. DNR has been applying its interpretation for at least a decade. In multiple

---

25. 663 P.2d 923, 931 (Alaska 1983).

26. AS 38.05.180(bb).

27. Moreover, the 1986 amendments provide that contract pricing can only be applied to gas sales made after the legislation's passage. The 1986 session law adopting AS 38.05.180(aa) includes a note stating that the statute is only to be applied prospectively: "The legislature finds that this authorization should apply prospectively and does not intend the authorization to apply to the valuation for royalty purposes of gas sold by a lessee under a gas sales contract entered into before the effective date of this Act." Ch. 55, § 1, SLA 1986.

28. *Wilson v. State, Dep't of Corr.*, 127 P.3d 826, 829 (Alaska 2006) (quoting *Bartley v. State, Dep't of Admin., Teacher's Ret. Bd.*, 110 P.3d 1254, 1261 (Alaska 2005)).

cases, we have recognized the special deference that is due to longstanding agency statutory interpretations. In *Bullock v. State*, we afforded a Department of Revenue interpretation "great weight" because it was "long-standing" and "continuous." [29] In *Bartley v. State*, we also emphasized how deference was due "when the agency's interpretation is longstanding." [30] In *Premera v. State*, we explained that we "apply a more deferential standard of review where an agency action is longstanding and continuous." [31] Since DNR's interpretation has been "longstanding and continuous," we apply this deferential standard of review and conclude that DNR's interpretation is reasonable.

### B. DNR Was Not Required To Promulgate Its Interpretation In A Regulation.

 Marathon argues that DNR's interpretation of the statute, even if valid, must be promulgated through a regulation before being applied to Marathon or any other party.[32] We use our independent judgment in deciding whether an agency action is a regulation.[33] Alaska Statute 38.05.020 provides that DNR may "establish reasonable proce-

dures and adopt reasonable regulations necessary to carry out this chapter." Alaska Statute 38.05.020 requires that regulations so adopted must comply with Alaska's Administrative Procedure Act (APA).[34]

We have been hesitant to force agencies to promulgate all statutory interpretations as regulations.[35] Other courts have been similarly reluctant to require agencies to convert statutory interpretations into regulations, especially in matters that the agency would have had difficulty foreseeing. The United States Supreme Court in *SEC v. Chenery* explained this limitation: "[P]roblems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule." [36] We stated in *Alyeska Pipeline Service Co. v. State* that a "requirement that each [agency] interpretation be preceded by rulemaking would result in complete ossification of the regulatory state." [37] It would be counterproductive to require DNR to devote its resources to promulgating regulations on every possible eventuality. We have previously explained that "absent statutory restrictions and due process limitations, administrative agencies have the discretion to set policy by adjudica-

**29.** 19 P.3d 1209, 1210, 1215 (Alaska 2001).

**30.** 110 P.3d at 1261.

**31.** 171 P.3d 1110, 1119 (Alaska 2007).

**32.** The Administrative Procedure Act defines a "regulation." AS 44.62.640(a)(3) (" 'regulation' means every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of a rule, regulation, order, or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of a state agency; 'regulation' does not include a form prescribed by a state agency or instructions relating to the use of the form, but this provision is not a limitation upon a requirement that a regulation be adopted under this chapter when one is needed to implement the law under which the form is issued; 'regulation' includes 'manuals,' 'policies,' 'instructions,' 'guides to enforcement,' 'interpretative bulletins,' 'interpretations,' and the like, that have the effect of rules, orders, regulations, or standards of general application, and this and similar phraseology may not be used to avoid or

circumvent this chapter; whether a regulation, regardless of name, is covered by this chapter depends in part on whether it affects the public or is used by the agency in dealing with the public").

**33.** *Alaska Ctr. for the Env't v. State*, 80 P.3d 231, 243 (Alaska 2003) ("Whether the agency action is a regulation is a question of law that does not involve agency expertise, so we apply our independent judgment.").

**34.** AS 38.05.020(b)(1).

**35.** *See Burke v. Houston NANA*, 222 P.3d 851, 867 (Alaska 2010); *see also* RICHARD J. PIERCE, JR., 1 ADMINISTRATIVE LAW TREATISE § 6.9, at 504 (5th ed. 2010) ("Courts cannot require agencies to make 'rules' only through rulemaking because sometimes an agency is justified in eschewing rulemaking in favor of gradual development of 'rules' through adjudication of cases. . . . ").

**36.** 332 U.S. 194, 202–03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

**37.** 145 P.3d 561, 573 (Alaska 2006).

tion instead of rulemaking." [38] Here, DNR made its statutory interpretation in the context of adjudicating applications for contract pricing. Because we permit agencies to make new statutory interpretations in adjudications and because DNR's interpretation does not impose "any new substantive requirements," [39] we hold that DNR was not required to promulgate its interpretation in a regulation.

### C. Due Process

Marathon claims that "[d]ue process considerations are triggered by DNR's refusal to consider Marathon's request under the legislative criteria." But, as the State notes, it is somewhat difficult to discern what due process violation Marathon is alleging. The Alaska Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law." [40] The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." We have held that the "crux of due process is the opportunity to be heard and the right to adequately represent one's interests." [41]

Marathon did have sufficient notice and the opportunity to represent its interests. Marathon argues that DNR did not adequately "apprise" Marathon of the grounds on which DNR would make its decision. Marathon argues that because it did not have adequate notice of DNR's earlier interpretation of the statute, Marathon was therefore denied the "opportunity to defend its request and have its merits judged."

■ But DNR has relied on its interpretation of AS 38.05.180(aa) for over a decade. As we explained in *Alyeska Pipeline Service Co. v. State*, a statute itself can provide constructive notice of an agency's interpretation.[42] The statute in *Alyeska Pipeline*, like AS 38.05.180(aa), was silent on the issue in question. Nevertheless, we explained that, since the agency's interpretation was reasonable, a "careful reading" of that statute "should have alerted Alyeska to the possibility" that the agency could interpret the statute the way it did.[43] The fact that AS 38.05.180(aa) does not expressly prohibit retroactive requests does not mean that Marathon can assume that the statute allows retroactivity. Accordingly, we conclude that Marathon did have adequate notice that DNR could interpret AS 38.05.180(aa) as not allowing retroactive contract pricing.

■ Moreover, DNR did provide Marathon with notice of its decision on Marathon's request, and Marathon had the opportunity to present its arguments to DNR. After Marathon submitted its request, DNR rejected the request because it was retroactive. Marathon requested reconsideration and argued that AS 38.05.180(aa) does permit retroactivity. DNR affirmed its earlier decision and explained its interpretation that "AS [3]8.05.180(aa) does not authorize the Department of Natural Resources to grant retroactive approval." Because Marathon had both adequate notice and a fair opportunity to present its claims, we conclude that its due process rights were not violated.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's decision.

CHRISTEN, Justice, not participating.

**38.** *Amerada Hess Pipeline Corp. v. Alaska Pub. Utils. Comm'n,* 711 P.2d 1170, 1178 (Alaska 1986).

**39.** *Smart v. State, Dep't of Health & Soc. Servs.,* 237 P.3d 1010, 1017 (Alaska 2010).

**40.** Alaska Const. art. I, § 7.

**41.** *Groom v. State, Dep't of Transp.,* 169 P.3d 626, 635 (Alaska 2007).

**42.** 145 P.3d at 571.

**43.** *Id.*