*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TECK AMERICAN INCORPORATED and STATE OF ALASKA, DEPARTMENT OF NATURAL RESOURCES, | ) ) ) ) ) | Supreme Court Nos.: S-18082/18101 |
| | ) | Superior Court No.: 3AN-19-10673 CI |
| Appellants, | ) ) | O P I N I O N |
| v. | ) ) | No. 7647 – April 21, 2023 |
| VALHALLA MINING, LLC, | ) ) ) | |
| Appellee. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: James N. Leik and Elena M. Romerdahl, Perkins Coie LLP, Anchorage, for Appellant Teck American Incorporated. Brian E. Gregg, Assistant Attorney General, and Dana S. Burke, Senior Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellant State of Alaska, Department of Natural Resources. Matthew Singer and Lee C. Baxter, Schwabe, Williamson & Wyatt, P.C., Anchorage, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

CARNEY, Justice.

## I.    INTRODUCTION

After a mining company abandoned its mining claims, the claims were located and recorded by a second mining company, which also abandoned the claims. After the second company abandoned the claims, the first company attempted to cure its earlier abandonment. The same year that the first company filed to cure its abandonment, a third mining company attempted to locate and record ownership of some of the same claims. The Department of Natural Resources (DNR) refused to issue permits to the third company, reasoning that the first one had validly cured its abandonment of its claims before the third company located the claims. After exhausting its administrative remedies, the third company appealed DNR's decision to the superior court. The superior court reversed DNR's decision. Because DNR's interpretation of the controlling statute was reasonable, we reverse the superior court decision and affirm DNR's decision.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

In 1994 Cominco American Inc. located and recorded ownership of a number of mining claims called the "Smucker" claims. It later conveyed the claims to a related company, CAI Inc., a Washington corporation authorized to do business in Alaska under an Alaska certificate of authority issued in 1999 (67504-F). CAI Inc. changed its corporate name three times: to Cominco American Inc. in 1999; to Teck Cominco American Inc. in 2001; and to TCAI, Inc. in 2008. Although Cominco American Inc. changed its name in 2001 to Teck Cominco American Inc. in Washington, it did not amend its Alaska certificate of authority to reflect this change. From 2001 to 2007 Affidavits of Annual Labor (AALs) listed the owner of the Smucker claims as Teck Cominco American Inc. even though it was not authorized to do business in Alaska at the time.

When Teck Cominco American Inc. changed its name to TCAI Inc. in 2008, it amended its certificate of authority to reflect the name change. But TCAI filed statements of labor that did not identify TCAI as the owner of the Smucker claims, which constituted an abandonment of those claims by statute in 2008.[1]

In 2011 American Energies Resources, Inc. (AERI) located the abandoned Smucker claims and recorded ownership of them. AERI's successor abandoned the claims in 2016. In October 2017 TCAI attempted to cure its ownership of the Smucker claims under AS 38.05.265(b) by recording corrected statements of labor and paying the associated fees and penalties to DNR.[2] Two months later a third mining company, Valhalla, Inc., attempted to locate and record nearby claims called the "Jiffy" claims, many of which overlapped with the Smucker claims. TCAI then quitclaimed the Smucker claims to a related entity, Teck American Inc., the current holder.[3]

In February 2018 DNR's Division of Mining, Land and Water (the Division) sent notice to Teck acknowledging its reinstated ownership of the Smucker claims.[4] In April the Division notified Valhalla that it would not issue a permit for some

---

[1] *See* AS 38.05.265(a) (stating that failure to record timely statements of labor constitutes abandonment); former 11 Alaska Administrative Code (AAC) 86.220(c), (g) (am. 8/26/98) (requiring statements of labor to contain essential facts, such as name of current owner, and rendering void statements of labor that do not contain them).

[2] *See* AS 38.05.265(b) (describing how "a person may cure the failure to record . . . that constituted the abandonment and cure the abandonment" by properly recording a statement of labor and paying required fees, royalties, and penalties "[u]nless another person has located a mining claim or leasehold location that includes all or part of the mining claim or leasehold location abandoned").

[3] For clarity we refer to the current and previous holders of Cominco American Inc.'s interest in the Smucker claims as Teck, except where a distinction is necessary.

[4] The letter was addressed to Teck American Incorporated although TCAI did not quitclaim its interests to Teck until March 16, 2018.

of its Jiffy claims because they overlapped with the Smucker claims. In November the Division granted all of Valhalla's land use permits for the Jiffy claims except the ones that overlapped with Teck's Smucker claims. The Division reasoned that Teck had cured its abandonment of the Smucker claims before Valhalla had located and recorded its claims, and Teck was therefore the rightful owner of the claims.

### B. Proceedings

#### 1. Appeal to DNR

Valhalla timely filed a formal appeal of the Division's decision with DNR in November 2018. Both Teck and Valhalla submitted letters to DNR in support of their ownership of the Smucker claims. In September 2019 DNR's Commissioner issued a final decision in favor of Teck. The Commissioner concluded that Teck had successfully cured its abandonment of the Smucker claims under AS 38.05.265(b). She rejected Valhalla's argument that Teck was not allowed to cure its abandonment once AERI had properly located and recorded ownership of the abandoned Smucker claims. The Commissioner reasoned that Teck was able to cure its abandonment under AS 38.05.265(b) because AERI had abandoned the claims when Teck filed the required documents to cure; therefore there were no active intervening claims preventing Teck from curing. The Commissioner also rejected Valhalla's argument that Teck was barred from curing its abandonment because it had previously failed to record statements of labor within the two-year period required by a different statute, AS 38.05.210(c).[5] The Commissioner concluded that AS 38.05.265(b) did not place a time limit on a party's ability to cure its abandonment.

---

[5] *See* former AS 38.05.210(c) (2019) (allowing "statement of annual labor . . . [to] be amended within two years of the date by which the annual labor statement was required to be recorded"). A recent amendment to the statute shortened time for entries to 90 days. Ch. 31, §8, SLA 2020.

Valhalla appealed DNR's final decision to the superior court.[6]

## 2. Appeal to the superior court

Following briefing the superior court held oral argument in April 2021. The superior court reversed DNR's decision. The court first determined that DNR's interpretation of the process to cure abandonment of mining claims under AS 38.05.265(b) did not implicate DNR's expertise or its determination of fundamental policy. The court applied its independent judgment in interpreting the statute rather than the more deferential "reasonable basis" standard of review.

The superior court interpreted the word "location" in AS 38.05.265(b) to mean the physical staking of the claim with markers,[7] and it found that once Teck's stakes or monuments had been replaced by AERI's, Teck could not cure its abandonment. The court found that the legislative history specifically contemplated that a person could cure abandonment of a claim if "no one had staked the intervening rights."[8] The court emphasized that the purpose behind Alaska's mining laws was to encourage the development of resources and that the laws were "designed for miners out in the field . . . not lawyers."[9] It reasoned that Teck's attempt to cure did not involve "a small miner rushing to fix an error in filing," which it believed was the legislature's

---

[6] *See* AS 22.10.020(d) ("The superior court has jurisdiction in all matters appealed to it from a subordinate court, or administrative agency . . . ."); Alaska R. App. P. 601(b) ("An appeal may be taken to the superior court from a . . . final decision of an administrative agency . . . .").

[7] *See* AS 38.05.195 (describing process for locating mining claim and requiring "location's corners [to] be distinctly marked on the ground").

[8] Minutes, H. Fin. Comm. Hearing on H.B. 344, 23rd Leg., 2d Sess. at 8 (Mar. 2, 2004) (comments of Bob Loeffler, Director, Dep't of Nat. Res. Mining, Land & Water Div.).

[9] Minutes, Sen. Res. Standing Comm. Hearing on S.B. 155, 31st Leg., 2d Sess. at 5 (Feb. 5, 2020) (statement of Chad Hutchinson, Counsel, Sen. Majority Off.) (alteration in original).

focus when passing the statute, but was an attempt to cure abandonment of claims "that occurred a decade before." The court concluded that the plain language of AS 38.05.265(b), in addition to its legislative history and purpose, supported Valhalla's interpretation that the statute precluded Teck's ability to cure once AERI located the abandoned Smucker claims and recorded ownership.

Teck and DNR separately appealed the superior court's decision. We consolidated the appeals.

## III. STANDARD OF REVIEW

"When the superior court acts as an intermediate court of appeal, we give no deference to its decision. Rather, we review the merits of the administrative agency determination directly."[10] "We review an agency's factual findings 'to determine whether they are supported by substantial evidence,' meaning 'such relevant evidence as a reasonable mind might accept as adequate to support [the agency's] conclusion.' "[11] There are two standards of review for an agency's interpretation of a statute: the reasonable basis standard and the independent judgment standard.[12] If "the interpretation at issue implicates agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions," we apply the reasonable basis standard, deferring to the agency's interpretation "so long as it is reasonable."[13] "If no agency expertise is involved in the agency's interpretation, we apply the

---

[10]     *N. Alaska Env't Ctr. v. State, Dep't of Nat. Res.*, 2 P.3d 629, 633 (Alaska 2000).

[11]     *French v. Alaska Oil & Gas Conservation Comm'n*, 498 P.3d 1026, 1028 (Alaska 2021) (alteration in original) (quoting *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 630 (Alaska 2011)).

[12]     *See Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011).

[13]     *Id.*

substitution of judgment standard."[14]  Under the substitution of judgment standard, "we exercise our independent judgment, substituting it 'for that of the agency even if the agency's [interpretation] ha[s] a reasonable basis in law.' "[15]

## IV.  DISCUSSION

### A.  The Reasonable Basis Standard Applies.

The parties disagree whether the superior court applied the proper standard of review to DNR's conclusion that AS 38.05.265(b) allows curing the abandonment of a mining claim after that same claim has been located, recorded, and abandoned by a subsequent party.  Teck and DNR argue that DNR's interpretation of AS 38.05.265(b) should be reviewed under a "reasonable basis" standard because it required the resolution of policy questions and implicated the agency's technical expertise.  Valhalla argues that the superior court's "substitution of judgment/ independent judgment standard of review" was correct because interpreting AS 38.05.265(b) "does not implicate DNR's expertise in any way."  We analyze both arguments to determine the correct standard of review.

Teck argues that this case is analogous to *Alyeska Pipeline Service Co. v. State*.[16]  In *Alyeska Pipeline* a company challenged DNR's interpretation of AS 38.35.140(a), which governs the calculation of a lease price.[17]  We applied the reasonable basis standard because DNR "has special expertise" and "is charged with granting the[] leases and adjusting and collecting their rent."[18]  Similarly in *Marathon*

---

[14]    *City of Valdez v. State*, 372 P.3d 240, 246 (Alaska 2016).

[15]    *Id.* (alterations in original) (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

[16]    288 P.3d 736 (Alaska 2012).

[17]    *Id.* at 737.

[18]    *Id.* at 740.

*Oil Co. v. State, Department of Natural Resources* we reasoned that because DNR manages the state's resources and collects royalties from gas lessees, the question whether to allow retroactive application of contract pricing was within DNR's expertise.[19] We held "that the reasonable basis standard is appropriate when an agency's adjudication of a regulated party's claim 'requires resolution of policy questions which lie within the agency's area of expertise and are inseparable from the facts underlying the agency's decision.' "[20]

DNR also manages mining in Alaska, and questions involving abandonment and cure of mining claims are within DNR's expertise. The legislature delegated the authority to manage natural resources to DNR, and the process of curing abandonment and determining ownership of mining claims is a component of that authority.[21] DNR has special expertise in granting land use permits, in administering mining claims, and in collecting payments from holders of mining claims.[22]

Valhalla counters that in *AU International, Inc. v. State, Department of Natural Resources* we ruled that DNR's application of AS 38.05.265 is subject to the substitution of judgment standard of review.[23] In *AU International* a mining claim

---

[19]    254 P.3d 1078, 1082 (Alaska 2011).

[20]    *Id.* (quoting *Earth Res. Co. v. State, Dep't of Revenue*, 665 P.2d 960, 964 (Alaska 1983)).

[21]    *See* AS 44.37.020(a) ("The Department of Natural Resources shall administer the state program for the conservation and development of natural resources, including forests, parks, and recreational areas, land, water, agriculture, soil conservation, and minerals including petroleum and natural gas, but excluding commercial fisheries, sport fish, game, and fur-bearing animals in their natural state.").

[22]    *See e.g.*, 11 Alaska Administrative Code (AAC) 86.107 (2023); 11 AAC 86.110; 11 AAC 86.215.

[23]    971 P.2d 1034 (Alaska 1999).

owner recorded a statement of labor that listed only four of its 1,039 claims.[24] We were asked to consider whether the owner had abandoned its claims under AS 38.05.265 even if it had not intended to do so.[25] Because the question before us was "a legal question involving no agency expertise," we applied the substitution of judgment standard of review to consider whether the state mining claims at issue were "abandoned by action of law."[26]

This case does not require statutory interpretation to determine whether claims have been abandoned by action of law. Instead a determination must be made about how broadly to apply the right to cure created by statute. That determination implicates fundamental policies within DNR's statutory functions. Valhalla asked DNR to apply AS 38.05.265(b) to determine which of the competing claims prevailed. That application, in turn, affects the development of land and DNR's finances, as we explain further below. Because the question is not a purely legal one, as was the case in *AU International*, the reasonable basis standard is the appropriate one to review DNR's interpretation of AS 38.05.265(b).[27]

---

[24] *Id.* at 1036.

[25] *Id.* at 1035. *AU International* focused on a different subsection of AS 38.05.265; the legislature did not add section .265(b), the subsection at issue here, to AS 38.05.265 until 2004. *See* House Bill (H.B.) 344, 23d Leg., 2d Sess. (2004).

[26] *Id.* at 1037-38.

[27] *See Union Oil Co. of Cal. v. State*, 804 P.2d 62, 64 (Alaska 1990) (applying reasonable basis standard when case involved policy questions within agency's area of expertise).

**B.    DNR's Interpretation Of AS 38.05.265(b) Is Reasonable.**

When analyzing a statute, we first look to its plain language.[28]  We interpret the language using a sliding scale:  "the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be."[29]  We have recognized that "an agency's interpretation of a law within its area of jurisdiction can help resolve lingering ambiguity."[30]

**1.    Plain meaning**

In assessing statutory language, "unless words have acquired a peculiar meaning, by virtue of statutory definition or judicial construction, they are to be construed in accordance with their common usage."[31]  "[W]e presume that no words or provisions are superfluous and that the legislature intended 'every word, sentence, or provision of a statute to have some purpose, force, and effect.' "[32]

Alaska Statute 38.05.265(b) governs the process to cure abandoned mining claims:

> Unless another person has located a mining claim . . . that includes all or part of the mining claim or leasehold location abandoned under (a) of this section or the area is closed to mineral location . . . a person may cure the failure to record or pay rents or royalties that constituted the abandonment and cure the abandonment by (1) properly recording a

---

**28**    *Res. Dev. Council for Alaska, Inc. v. Vote Yes for Alaska's Fair Share*, 494 P.3d 541, 546 (Alaska 2021).

**29**    *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016).

**30**    *Wilson v. State, Dep't of Corr.*, 127 P.3d 826, 829 (Alaska 2006) (quoting *Bartley v. State, Dep't of Admin., Teacher's Ret. Bd.*, 110 P.3d 1254, 1261 (Alaska 2005)).

**31**    *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 905 (Alaska 1987).

**32**    *Adamson v. Mun. of Anchorage*, 333 P.3d 5, 16 (Alaska 2014) (quoting *Monzulla v. Voorhees Concrete Cutting*, 254 P.3d 341, 345 (Alaska 2011)).

certificate of location or a statement of annual labor, paying any required annual rental, and paying any required production royalty; and (2) paying a penalty equal to the annual rent for the mining claim or leasehold location that was abandoned under (a) of this section.

The specific phrase at issue is the exception to cure: "[u]nless another person has located a mining claim . . . that includes all or part of the mining claim or leasehold location abandoned." DNR interprets the phrase to mean that "miners [have] the ability to cure an abandoned claim unless there is a subsequent, existing claim 'that includes' (present tense) the miner's earlier abandoned claim." DNR argued before the superior court that "if the intervening locator subsequently relinquishes or abandons the overlapping claim, or never even perfected or acquired rights to the claim, it is reasonable to interpret the statute in a manner that permits the original claim owner to cure, if possible, whatever deficiency led to the abandonment." DNR's interpretation allows "a previous locator to cure its own abandonment so long as the land is not located by another entity or is not closed to mineral entry *at the time of the cure*." DNR argues that "the prohibition against a prior locator's cure last[s] only so long as the subsequent locator's claim is valid."

DNR supports its interpretation by noting that the verb "has located" is in the present-perfect tense. Valhalla argues that because "has located" modifies "includes," AS 38.05.265 "encompasses both past and present competing claims and precludes cure in either situation." The present-perfect tense "denotes an act, state, or condition that is now completed *or* continues up to the present."[33] DNR's interpretation relies on the second form of a present-perfect tense verb: if a subsequent miner's location is not continuous and ceases due to abandonment or relinquishment, there is

---

[33] THE CHICAGO MANUAL OF STYLE ¶ 5.132 (17th ed. 2017) (emphasis added).

no longer an impediment to the prior miner's cure. DNR's interpretation appears to be consistent with the plain language of the statute, but because DNR concedes that "has located" is "both open-ended and undefined," the plain language of the statute is ambiguous as to whether a right to cure is permanently extinguished by a subsequent claim. We therefore turn to the legislative history and purpose.

### 2. Legislative history and purpose

Alaska's ability to autonomously manage its mineral deposits was a condition of its admission to the Union.[34] In 1959 the legislature passed the Alaska Land Act and delegated the responsibility of managing state-owned land to DNR.[35] Alaska's mining program relies upon a wide variety of regulations, and DNR has significant decision-making power.[36]

The legislature added the cure provision to AS 38.05.265 in 2004.[37] Prior to this amendment mining claims were deemed abandoned for the reasons stated in what

---

[34]    Alaska Statehood Act, Pub. L. No. 85-508, § 6(a)-(b), 72 Stat. 339, 340 (1958) (granting Alaska authority to select certain public lands then administered by the federal government for transferal to State ownership).

[35]    *See* Ch. 169, SLA 1959; AS 44.37.020(a) (granting DNR the specific duty of administering "the state program for the conservation and development of natural resources, including . . . land, water, . . . and minerals").

[36]    *See generally* AS 38.05.185-.275; *see also* AS 38.05.020(a), (b) (granting DNR Commissioner authority to manage mining claims and to "establish reasonable procedures and adopt reasonable regulations necessary to carry out" this duty).

[37]    *See* H.B. 344, 23d Leg., 2d Sess. (2004).

is now section .265(a),[38] but there was no opportunity for cure.[39] Legislators wanted to create a process to cure abandoned mining claims and establish ownership in the event of "topfiling."[40] When asked what would happen "if a miner filed late and another miner 'staked' that claim," the then-Director of DNR's Mining, Land and Water Division replied that "[t]he bill could rectify the claim as long as no one had staked intervening rights. If someone staked in the interim, the language would not cure the problem."[41] He said that the purpose of the statute was to give the holder of an abandoned claim the opportunity to cure, as long as the cure did not displace a subsequent mining claim.[42] A discussion during the Senate Resources Committee illustrates this intent:

---

[38] AS 38.05.265(a) ("Failure to . . . timely record a certificate of location or statement of annual labor, timely pay any required annual rental, or timely pay any required production royalty . . . constitutes abandonment of all rights acquired under the mining claim . . . and the claim . . . is subject to relocation by others, unless the failure constituting the abandonment is cured under (b) of this section.").

[39] *See* former AS 38.05.265 (2000).

[40] "Topfiling" or "relocation" occurs when the owner of a mining claim does not file the required AALs by the deadline, pay the required fees, or include accurate essential facts on the AAL, and another person or entity travels to the site of the claim, stakes and marks the claim, and then files the necessary paperwork to claim ownership. *See generally* Minutes, Sen. Res. Standing Comm. Hearing on H.B. 344, 23rd Leg., 2d Sess. at 5-6 (Mar. 24, 2004) (statements of Rep. Hugh Fate & Sen. Scott Ogan, Chair, Sen. Res. Standing Comm.).

[41] Minutes, H. Fin. Comm. Hearing on H.B. 344, 23rd Leg., 2d Sess. at 8 (Mar. 2, 2004) (statement of Bob Loeffler, Director, Dep't of Nat. Res. Mining, Land & Water Div.).

[42] Minutes, H. Res. Standing Comm. Hearing on H.B. 344, 23rd Leg., 2d Sess. at 20-21 (Feb. 25, 2004) (statement of Bob Loeffler, Director, Dep't of Nat. Res. Mining, Land & Water Div.).

SENATOR ELTON asked if this would allow a miner to cure the problem of a late filing up to any period of time as long as nobody has filed a top claim or a claim on the claim.

REPRESENTATIVE FATE said that is correct. [….]

CHAIR OGAN asked, if a miner decides to abandon a claim and another person decides to topfile and then that first miner changes his mind, is there a time limit for paying the penalty and refiling. He pointed out that HB 344 has no time limit.

REPRESENTATIVE FATE said the first miner couldn't get his claim back if it had been topfiled by someone else.[43]

Valhalla argues that "[t]he legislative testimony is consistent that a former owner's ability to cure its abandonment of a claim is only available up until the point another person locates an overlapping claim. Then the ability to cure is extinguished." We agree that the legislative history and purpose reflect an intent to prevent a previous owner from using section .265(b)'s cure provision to displace the rights acquired by someone who located claims over all or part of the previously abandoned claims. However we do not interpret the discussions to answer the question posed here: whether cure is available when intervening rights are subsequently abandoned. When Teck exercised its statutory right to cure in October 2017, the area was free of any other claims.

Valhalla claims that Teck's cure should also be rejected in part because a "former miner must return to the site to re-stake and place monuments on any open land to re-take ownership of the claims." In section .265(b), the legislature affirmatively chose not to require curing parties to re-stake and erect new monuments. Instead, the

---

**43** Minutes, Sen. Res. Standing Comm. Hearing on H.B. 344, 23rd Leg., 2d Sess. at 5-6 (Mar. 24, 2004) (statements of Rep. Hugh Fate & Sen. Scott Ogan, Chair, Sen. Res. Standing Comm.).

legislature chose to allow claim holders to cure their abandonment by recording a certificate of location or a statement of annual labor and paying a penalty. As the legislation's sponsor indicated, the bill was intended to allow miners to keep their claims "by filing the paperwork and paying a penalty equal to one year[']s rent."[44] Stakes and monuments are required when initially establishing claims, but once a claim is properly established by staking, erecting monuments, and recording notice, there is no requirement to keep the stakes and monuments in place.[45] Legal notice to other potential claimants is provided by recording a certificate of location, not impermanent physical markers.[46] The cured claim is valid despite the absence of the stakes and monuments that initially established the claim.

As the Commissioner observed, DNR's interpretation "allows DNR the most flexibility in returning the land to developable status and allows DNR to collect higher annual rents in accordance with the longevity of the claims." We have previously recognized that "the overall purpose of the Alaska Land Act is to maximize revenue for the state,"[47] and DNR's interpretation of section .265(b) does that. Higher rents are achieved when mining claim holders are permitted to cure an abandoned claim

---

[44] Minutes, H. Fin. Comm. Hearing on H.B. 344, 23rd Leg., 2d Sess. at 7 (Mar. 2, 2004) (statement of Rep. Hugh Fate).

[45] *See* AS 38.05.195(b)-(c); *Dodge v. Wilkinson*, 664 P.2d 157, 159-60 (Alaska 1983).

[46] AS 38.05.195(c) ("Within 45 days after the date of attaching the notice of location on the monument, the locator shall record a certificate of location . . . .").

[47] *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1085 (Alaska 2011); *City of Kenai v. Cook Inlet Nat. Gas Storage Alaska, LLC*, 373 P.3d 473, 481 (Alaska 2016).

because mining rents increase over time.[48] We conclude that DNR's construction of the statute is consistent with this purpose.

Because the statute is ambiguous and does not directly answer whether a mining claim may be cured after a subsequent claimant has claimed and abandoned the claim,[49] we conclude that DNR's interpretation is reasonable. We therefore defer to DNR's interpretation of AS 38.05.265(b).

## C. DNR's Application Of AS 38.05.265(b) Was Reasonable.

DNR concluded (1) that abandonment occurred in 2008 when Teck failed to "properly fil[e] affidavits of annual labor that identified TCAI Incorporated as the owner," (2) that Teck was not required to meet a two-year deadline because "Alaska Statute 38.05.265(b) specifically speaks to the ability to cure post-abandonment and does not place any time limit on the party seeking to cure," and (3) that Teck's cure overrode Valhalla's interest in the overlapping Smucker claims. We address each of its determinations in turn.

---

[48]    "[T]he amount of the annual rental payment is based on the number of years since a mining claim or leasehold location was first located . . . ." 11 AAC 86.221(b) (2022). Rents for older claims (11 years or more) are approximately five times higher than rents for new claims. *Id.* Permitting Teck to cure abandonment enabled DNR to charge annual rent based on the first location of the Smucker claims in 1994, rather than annual rent for Valhalla's new claims first located in 2017. This interpretation also allows DNR to collect rent from 2008-2017, which would not be allowed without the cure.

[49]    Valhalla cites federal mining law and *McGlinchy v. State, Dep't of Nat. Res.*, 354 P.3d 1025, 1029 (Alaska 2015), and asserts that "Alaska generally applies federal mining law." But in *McGlinchy* we noted that "federal mining law applies only '[u]nless otherwise provided' and 'as supplemented by state law.' " *Id.* at 1035 n.72 (quoting AS 38.05.185(c)). When "the relevant state statute clearly addresses the subject of abandonment of state claims, we need not construe our statute in accordance with 'usages and interpretations' applicable to the federal mining laws." *AU Int'l, Inc. v. State, Dep't of Nat. Res.*, 971 P.2d 1034, 1039 (Alaska 1999).

### 1. DNR's conclusion that Teck abandoned the claims in 2008 rather than 2001 was reasonable.

DNR notes that the AALs recorded in 2001 through 2007 stated the name of the corporate entity that held the Smucker claims at that time, Teck Cominco American Inc., but it determined that Teck abandoned its claims in 2008 by "identifying the wrong corporate entity" as the owner of the Smucker claims. Valhalla argues that Teck's interest was abandoned in 2001 by Teck's failure to record AALs with accurate essential facts, such as "the name and current mailing address of each owner."[50]

For a company or corporation to own a mining claim, that corporation must be organized "under the laws of the United States or of any state or territory of the United States," and be "qualified to do business in [Alaska]."[51] Alaska Statute 10.06.738(a) provides that "[a] foreign corporation authorized to transact business in this state shall obtain an amended certificate of authority if it changes its corporate name."[52]

Cominco American Inc. had a valid certificate of authority when it located the Smucker claims in 1994 and quitclaimed them to CAI Inc., a Washington corporation, in 1999. CAI Inc. then obtained a certificate of authority to do business in Alaska, and the Alaska Division of Corporations designated CAI Inc. as Alaska corporate entity number 67504-F. CAI Inc. changed its name to Cominco American Inc. in 1999 and then again to Teck Cominco American Inc. in 2001. As of July 2001 Alaska entity number 67504-F — which held the claims from 1999 until their abandonment in 2008 — was officially Teck American Inc. in Washington but remained Cominco American Inc. in Alaska. Teck did not report nor did it obtain an amended certificate of authority from the Alaska Division of Corporations reflecting

---

[50] 11 AAC 86.220(c)(3) (2021).

[51] AS 38.05.190(a)(5).

[52] AS 10.06.738(a).

the corporation's name change from CAI Inc. to Teck Cominco American Inc. But from 2001-2007 Teck satisfied AS 38.05.210(c) by filing statements of labor that reflected the correct current owner (Teck American Inc.) and mailing address.

A foreign corporation's failure to amend a certificate of authority under AS 10.06.738(a) does not constitute an abandonment according to AS 38.05.265(a).[53] DNR clarified that "[t]he certificate of authority for Alaska entity #67504F was never revoked or suspended, and remained a valid certificate, although it did not always reflect the proper corporate name." We conclude that DNR's conclusion that Teck abandoned the claims in 2008 rather than 2001 was reasonable.

### 2. DNR's conclusion that there was no two-year deadline was reasonable.

DNR concluded that Teck was not required to cure its abandonment of the Smucker claims within two years under AS 38.05.265(b). But Valhalla argues that since Teck failed to file statements of labor within two years of the abandonment, AS 38.05.210(c) prevented Teck from curing under AS 38.05.265(b).[54] We conclude that DNR's interpretation is supported by the plain language of AS 38.05.265(b).

At the time of the dispute, AS 38.05.210(c) allowed amendments to statements of annual labor "within two years of the date by which the annual labor statement was required to be recorded."[55] But statements that failed to set out the

---

[53] *See* AS 38.05.265(a) (listing conditions that constitute abandonment).

[54] Owners of mining claims are required to record a signed statement of labor yearly that can be amended under AS 38.05.210(c). 11 AAC 86.220 (2021).

[55] Former AS 38.05.210(c) (2019). The statute was amended in 2020 by Ch. 31, § 8, SLA 2020 (changing time to correct or amend statements of labor to 90 days).

essential facts were void and could not be amended.[56]  Because Teck filed statements of labor that identified the wrong corporate owner from 2008-2017, the statements lacked the requisite essential facts, were void, and could not be amended.  Alaska Statute 38.05.210(c) was not relevant.  The only remedy for a void AAL and consequent abandonment of a claim was the cure provision in section .265(b), which contains no time limit in its plain language.[57]

### 3. DNR's decision that Teck was the rightful owner of the Smucker claims was reasonable.

Teck met all of the cure requirements in October 2017, and the Division recognized Teck's completion of these requirements in February 2018.  When Teck took the required steps to cure its 2008 abandonment, there were no intervening claims that included part or all of the abandoned Smucker claims because AERI's claim was abandoned by its successor in 2016.  Based on its experience managing mining claims and its interpretation of AS 38.05.265(a), DNR concluded that cure was allowed.  When Valhalla attempted to claim ownership of some of the Smucker claims in December 2017 — two months after Teck's cure — DNR denied its claim because they were no longer available after Teck's cure.  DNR's decision was reasonable.

## V. CONCLUSION

We REVERSE the superior court's decision and AFFIRM DNR's decision.

---

[56]  Former AS 38.05.265(a) (2019) ("A statement of annual labor that does not accurately set out the essential facts is void and of no effect."); former 11 AAC 86.220(g) (am. 8/26/98) ("[A]n affidavit that does not set out the essential facts is void under AS 38.05.265 and may not be amended.").

[57]  *See* AS 38.05.265(b) (containing no express time limit in order to cure).